O

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

SIMON BALLADAREZ,                               )   NO. CV 13-9490-MAN
                                                )
            Plaintiff,                          )
                                                )   MEMORANDUM OPINION
      v.                                        )
                                                )   AND ORDER
CAROLYN W. COLVIN,                              )
Acting Commissioner of Social                   )
Security,                                       )
                                                )
            Defendant.                          )
_____         )

**INTRODUCTION**

        Plaintiff filed a Complaint on December 26, 2013, seeking review of the denial of plaintiff's application for a period of disability and disability insurance benefits ("DIB").  On January 30, 2014, the parties consented, pursuant to 28 U.S.C. § 636(c), to proceed before the undersigned United States Magistrate Judge.  (ECF Nos. 7, 8.)  On October 14, 2014, the parties filed a Joint Stipulation ("Joint Stip.") in which plaintiff seeks an order reversing the Commissioner's decision and awarding full benefits to plaintiff.  (Joint Stip. at 42-43.)  The Commissioner has agreed to a voluntary remand for further development of the record at step five of the sequential evaluation but requests that the ALJ's decision be affirmed in all other respects.  (*Id.* at 43-44.)  The Court

has taken the matter under submission after oral argument.

**SUMMARY OF ADMINISTRATIVE PROCEEDINGS**

On January 16, 2008, plaintiff, then 58 years old,[1] protectively applied for a period of disability and DIB.  (Administrative Record ("A.R.") 235.)  Plaintiff alleged disability commencing October 30, 2007, due to an injury to his left leg.  (*Id.* 235, 254.)  Plaintiff had previously worked as a supervisor for a machine shop from 1971 to 2005, when he was laid off.  (*Id.* 254-55.)

After the Commissioner denied plaintiff's application, plaintiff requested a hearing.  (*See* A.R. 131.)  On October 7, 2009, plaintiff, who was represented by counsel, appeared at a hearing before Administrative Law Judge James D. Goodman ("ALJ").  (*Id.* 109, 115.)  On October 29, 2009, the ALJ issued an unfavorable decision.  (*Id.* 115.)  On February 4, 2011, the Appeals Council granted Petitioner's request for review and vacated the ALJ's decision.  (*Id.* 117-18.)  The Appeals Council ordered the ALJ on remand to, *inter alia*, obtain evidence from a vocational expert to clarify the demands of plaintiff's past relevant work and, if necessary, determine whether he had acquired any skills that are transferable with very little, if any, vocational adjustment to other occupations.  (*Id.* 118.)  On remand, the ALJ held three hearings.  (*See id.* 12.)  Plaintiff, who was represented by counsel, appeared at all four hearings and testified at the third hearing, held on May 1, 2012.  (*See id.*)  The ALJ also obtained testimony from Victoria Rei, a vocational expert ("VE"), by interrogatory.  (*See id.* 352-58, 375-85.)  No other testimony was given.  (*See generally id.* 43-79.)  On October 25, 2012, the ALJ denied plaintiff's claim.  (*Id.* 9-36.)  On November 22, 2013, the Appeals Counsel denied plaintiff's request for review.  (*Id.* 1-3.)

---

[1]  Plaintiff was born on May 26, 1949.

2

1

2

## SUMMARY OF ADMINISTRATIVE DECISION

3      In his October 25, 2012 decision, the ALJ found that plaintiff had not engaged in substantial
4  gainful activity from his alleged onset date of October 30, 2007. (A.R. 23.)  The ALJ determined
5  that plaintiff has the medically determinable impairments of "status post left patellar tendon
6  reconstruction on November 8, 2007; previously uncontrolled hypertension and diabetes mellitus,
7  currently controlled with medications; and obesity" and that these impairments, in combination,
8  were severe.  (*Id.* 23-25.)  However, the ALJ also concluded that none of these impairments,
9  either independently or in combination, satisfied the requirements of a listed impairment in 20
10  C.F.R. part 404, subpart P, appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).  (*Id.* 25-
11  26.)

12

13      The ALJ determined that plaintiff had the residual functional capacity ("RFC") to perform
14  light work as defined in 20 C.F.R. § 404.1567(b), except that he could:  "lift and carry up to
15  twenty (20) pounds occasionally and ten (10) pounds frequently[;]" "stand and walk up to six (6)
16  hours and sit up to six (6) hours, cumulatively, in an eight (8) hour work day[;]" "sit for up to 1½
17  hour increments, stand in one place for up to ½ hour at any one time[;]" "walk one mile without
18  resting[;]" and "climb, balance, and kneel on a frequent basis."  (A.R. 27.)  Finally, the ALJ
19  concluded that, although plaintiff was unable to perform any of his past relevant work, he could
20  perform other jobs that existed in significant numbers in the national economy, including those
21  of an Extrusion Die Repairer (DOT 705.381-014), Experimental Welder (DOT 819.281-022), and
22  Tool and Die Supervisor (DOT 601.130-010).  (*Id.* 32, 34-25.)  Thus, the ALJ found that plaintiff
23  was not disabled.  (*Id.* 20.)

24

25

## STANDARD OF REVIEW

26

27      Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine
28  whether it is free from legal error and supported by substantial evidence in the record as a whole.

3

1    Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007).  "Substantial evidence is 'more than a mere

2    scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might

3    accept as adequate to support a conclusion.'"  Gutierrez v. Comm'r of Soc. Sec., 740 F.3d 519,

4    522-23 (9th Cir. 2014) (internal citations omitted).  "Even when the evidence is susceptible to

5    more than one rational interpretation, we must uphold the ALJ's findings if they are supported by

6    inferences reasonably drawn from the record."  Molina v. Astrue, 674 F.3d 1104, 1110 (9th Cir.

7    2012).

8

9        Although this Court cannot substitute its discretion for that of the Commissioner, the Court

10   nonetheless must review the record as a whole, "weighing both the evidence that supports and

11   the evidence that detracts from the [Commissioner's] conclusion."  Lingenfelter v. Astrue, 504

12   F.3d 1028, 1035 (9th Cir. 2007) (internal quotation marks and citation omitted); Desrosiers v.

13   Sec'y of Health and Hum. Servs., 846 F.2d 573, 576 (9th Cir. 1988).  "The ALJ is responsible for

14   determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities."

15   Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).

16

17       The Court will uphold the Commissioner's decision when the evidence is susceptible to

18   more than one rational interpretation.  Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).

19   However, the Court may review only the reasons stated by the ALJ in his decision "and may not

20   affirm the ALJ on a ground upon which he did not rely."  Orn, 495 F.3d at 630; see also Connett

21   v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003).  The Court will not reverse the Commissioner's

22   decision if it is based on harmless error, which exists only when it is "clear from the record that

23   an ALJ's error was 'inconsequential to the ultimate nondisability determination.'"  Robbins v. Soc.

24   Sec. Admin., 466 F.3d 880, 885 (9th Cir. 2006) (quoting Stout v. Comm'r of Soc. Sec., 454 F.3d

25   1050, 1055 (9th Cir. 2006)); see also Carmickle v. Comm'r of Soc. Sec., 533 F.3d 1155, 1162 (9th

26   Cir. 2008).

27

28

4

**DISCUSSION**

Plaintiff alleges five sources of error.  First, plaintiff claims that the ALJ denied him the opportunity to effectively cross-examine the VE.  (Joint Stip. at 3.)  Second, plaintiff claims that the ALJ erred in failing to find that plaintiff's mental impairment was a severe medically determinable impairment.  (*Id.* 3, 15-20.)  Third, plaintiff contends that the ALJ erred in failing to find that plaintiff's shoulder impairments and degenerative joint disease in his right knee were severe medically determinable impairments.  (*Id.* 3, 26-28.)  Fourth, plaintiff contends that the ALJ failed to properly assess the opinion of Dr. Sachin Patel, an orthopedic surgeon and plaintiff's treating physician.  (*Id.* 3, 30-33.)  Lastly, plaintiff asserts that the ALJ failed to properly credit plaintiff's subjective symptom testimony.  (*Id.* 3, 36-39.)

Defendant agrees with plaintiff's first contention that the ALJ denied plaintiff an opportunity for effective cross-examination.  (*See* Joint Stip. at 13-14).  However, because defendant and plaintiff disagree about the appropriate remedy for the ALJ's error, the Court addresses that issue last.  Plaintiff's other four contentions are discussed in the order in which they were raised.

I.  **The ALJ Erred In Finding That Plaintiff's Alleged Depression, Anxiety, And Shoulder And Right Knee Impairments Were Not Medically Determinable.**

A.  **Background**

Petitioner's second and third contentions concern the ALJ's failure to identify Petitioner's shoulder impairments, degenerative joint disease in his right knee, and anxiety and depression as medically determinable impairments at step two of the sequential analysis.  (*See* A.R. 3, 15-20.) The ALJ determined that plaintiff has the medically determinable impairments of "status post left patellar tendon reconstruction on November 8, 2007; previously uncontrolled hypertension

and diabetes mellitus, currently controlled with medications; and obesity" and that these impairments, in combination, were severe. (A.R. 23-25.) However, the ALJ found that plaintiff "fail[ed] to establish any other condition as a 'medically determinable impairment' as that term is defined in the regulations." (*Id.* 24.) The ALJ provided a two-page explanation for his decision, which is summarized below.

First, the ALJ found no "significant medical evidence to substantiate any other medically determinable impairments," observing that plaintiff's subjective complaints of pain and tenderness to medical sources were "insufficient to establish a medically determinable impairment" and, with regard to each of plaintiff's additional alleged impairments, "consistent objective data [was] lacking, the durational requirement [was] not met, or both." (A.R. 24.)

Second, the ALJ explained that plaintiff's testimony about the additional impairments he alleged was inconsistent, because plaintiff first testified that his condition had not changed since November 2009, but later stated that he had developed problems with his shoulders and his right knee and began receiving care for mental problems after the ALJ issued his original decision in 2009. (A.R. 24.) The ALJ wrote:

> It was not until his attorney prompted him with several specific -- and, frankly, quite leading -- questions that the claimant began to describe the alleged new problems discussed above -- which leads me to question how serious, persistent, and/or debilitating they must have been if the claimant did not even remember to mention them at the first opportunity to do so -- and even then, the claimant indicated under oath that prescription medications and/or other forms of care -- such as shoulder injections he has received "once in a while" and psychiatric medications that he receives from his primary care provider -- have afforded at least some relief for most, if not all, of these alleged new conditions.

6

1    (A.R. 24.)

2

3       **B.    Standard**

4

5       In disability benefits cases, a claimant must show that he suffers from an impairment

6    arising from "anatomical, physiological, or psychological abnormalities which can be shown by

7    medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1508.  "A

8    physical or mental impairment must be established by medical evidence consisting of signs,

9    symptoms, and laboratory findings," not only by the claimant's statement of his symptoms.  *Id.*

10   The Commissioner also requires "evidence from acceptable medical sources to establish whether

11   [a claimant] [has] a medically determinable impairment(s)."  20 C.F.R. § 404.1513(a).

12   "Acceptable medical sources" include licensed physicians, psychologists, optometrists, podiatrists,

13   and qualified speech-language pathologists but not social workers.  *See id.*  The Social Security

14   Act tasks the ALJ with determining credibility of medical testimony and resolving conflicting

15   evidence and ambiguities.  Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).  An opinion that

16   is more consistent with the record as a whole generally is considered more persuasive.  *See* 20

17   C.F.R. § 416.927(c)(4); 20 C.F.R. § 404.1527(c)(4).

18

19      **C.    The ALJ Erred In Failing To Find That Plaintiff's Depression And Anxiety**

20            **Were Medically Determinable Impairments.**

21

22      Records from Kaiser Permanente show that plaintiff was prescribed Celexa, an anti-

23   depressant, on September 2, 2009 (A.R. 621), and on March 6, 2010, he was diagnosed with a

24   generalized anxiety disorder and prescribed Ativan  (A.R. 736).  Accordingly, treatment notes

25   dated May 11, 2010 indicate that plaintiff suffered from "depression, major, recurrent, moderate

26   anxiety disorder, and mental disorder."  (A.R. 620 -- plaintiff's "problem list" as of 05/11/2010.)

27   Although plaintiff presumably saw a psychiatrist before being prescribed Ativan and Celexa, the

28   records make no reference to any treatment by a psychiatrist.  Instead, the record shows that

1  plaintiff regularly attended various private and group therapy sessions at Kaiser in 2010 and 2011.

2  (A.R. 771-1024.)  He received one-on-one talk therapy with Filomena Maria Meneses, a licensed

3  clinical social worker, (*see e.g.* A.R. 952),  and attended group therapy sessions with a marriage

4  and family therapist, Ilham-Al-Sarraf Rope (*see e.g.*, A.R. 900).   Neither Meneses nor Rope,

5  however, has the credentials to constitute an "acceptable medical source" for the purpose of

6  establishing a medically determinable impairment.  *See* 20 C.F.R. § 404.1513(a).

7

8       The only acceptable medical source to provide an opinion about whether plaintiff's alleged

9  mental limitations constituted a medically determinable impairment is the consulting clinical

10  psychologist, Amber Ruddock, Ph.D., to whom plaintiff was sent for an examination by ALJ

11  Goodman. (A.R. 1279-83 -- 12/23/11 examination.) Ruddock reported that plaintiff was "highly

12  anxious" when she examined him, "visibly shak[ing]" and "frequently tear[ing] up when discussing

13  areas that were particularly sensitive or hard to describe." (A.R. 1281.)  Although he performed

14  in the average range on Part A of the Trail Making Test, "Part B was stopped after 1 minute and

15  23 seconds with numerous errors due to his anxiety level interfering with his ability to complete

16  the task and him becoming clearly overwhelmed . . . plac[ing] him in the impaired range." (A.R.

17  1281.)   Ruddock also reported that plaintiff "has difficulty with memory when attempting to

18  describe painful events from his past" and his "attention and concentration span are mildly

19  diminished." (A.R. 1281.)  She further found that, based on plaintiff's performance on the Rey

20  15-Item Memory Test II, plaintiff's memory complaints were not exaggerated. (A.R. 1281-82.)

21  However, Ruddock also found that plaintiff's performance on the Minnesota Multiphasic Personality

22  Inventory ("MMPI-2") suggested that plaintiff was grossly exaggerating his symptoms.  (A.R.

23  1282.)  Based on her synthesis of these conflicting test results and her observations, Ruddock

24  concluded that plaintiff suffered from Major Depressive Disorder and Panic Disorder. (A.R. 1282.)

25  She assessed plaintiff's residual functional capacity as follows:

26

27       [He] would be able to understand, remember and carry out short, simplistic

28       instructions with mild difficulty.  He would have moderate difficulty to understand,

8

remember and carry out detailed and complex instructions.  He would have mild difficulty to make simplistic work-related decisions without special supervision.  He would have mild difficulty to comply with job rules such as safety and attendance. He would have moderate difficulty to respond to change in a normal workplace setting.  He would have moderate difficulty to maintain persistence and pace in a normal workplace setting . . . He presents with mild difficulty to interact appropriately with supervisors, coworkers and peers on a consistent basis.

(A..R. 1283.)

The ALJ characterized Ruddock's diagnoses and assessment of plaintiff's mental impairments as "based largely" on plaintiff's "subjective presentation" of his feelings. (A.R. 25.) In doing so, the ALJ relied heavily on plaintiff's performance on the MMPI-2 but seemed to disregard plaintiff's performance on two other objective tests (Part B of the Trail Making Test and the Rey 15-Item Memory Test II), both of which indicated that plaintiff was mentally impaired. Because Part B of the Trail Making Test and the Rey 15-Item Memory Test II were, presumably, "medically acceptable clinical and laboratory diagnostic techniques" that were supported by Ruddock's firsthand observations of plaintiff's presentation, the record does not support the ALJ's determination that plaintiff's alleged mental impairments had not been "shown by medically acceptable clinical and laboratory diagnostic techniques."  *See* 20 C.F.R. § 404.1508.

The ALJ also cited plaintiff's failure to seek or receive emergency room treatment or psychiatric hospitalization for his mental impairment and plaintiff's attestation that the medications prescribed by his primary care provider helped alleviate his symptoms.  (A.R. 25.)  However, the methods by which plaintiff treated, or failed to treat, his alleged mental impairments are not relevant to a determination of whether plaintiff has a "medically determinable" mental impairment. Instead, as explained above, the only question for the ALJ at this early step in the sequential analysis is whether plaintiff has an anatomical, physiological, or psychological abnormality that

"can be shown by medically acceptable clinical and laboratory diagnostic techniques." *See* 20 C.F.R. § 404.1508. Dr. Ruddock's report plainly shows that plaintiff does.

### D. The ALJ Erred In Failing To Find That Plaintiff Had Additional Medically Determinable Physical Impairments.

The ALJ similarly erred in failing to find that plaintiff's degenerative joint disease (also known as osteoarthritis) in his right knee and his bilateral rotator cuff tear were medically determinable impairments. The record shows that, on September 2, 2009, Jay Iinuma, M.D., filled out a residual functional capacity questionnaire in which he stated that he: saw plaintiff on a monthly basis; had diagnosed plaintiff with severe osteoarthritis, crepitus, and right knee tenderness; and estimated that plaintiff could only walk a quarter of a city block without rest, could only stand for ten minutes at a time, and could stand/walk for less than two hours. (A.R. 603-06.) Less than three months after Dr. Iinuma's assessment, Dr. Thomas Ewald Heer, an orthopedic surgeon, reviewed plaintiff's xrays and agreed that plaintiff suffered from degenerative joint disease in his right knee. (A.R. 1064.) He treated plaintiff by injecting the site with a mixture of Kenalog and Lidocaine. (*Id.* 1064, 1070.) At a follow up visit in March 2010, plaintiff elected to defer a second injection in favor of a prescription for 600 mg of Ibuprofen. (A.R. 109-71.) During a third appointment with Dr. Heer on July 7, 2010, plaintiff reported "bilateral shoulder pain" and received a referral for diagnosis and treatment.[2] (A.R. 1084.)

On August 10, 2010, plaintiff saw Dr. Jerry L. Schilz, who diagnosed plaintiff with a bilateral shoulder rotator cuff tear and referred plaintiff to radiology to schedule an MRI. (A.R. 1097-98.) On August 23, 2010, plaintiff received an MRI of his right shoulder. (*See* A.R. 1102.) The MRI showed "full thickness tear of the supraspinatus and the infraspinatus tendons with severe muscle atrophy. Biceps tendon tear." (A.R. 1103.) On September 7, 2010 Dr. Schilz reviewed the x-rays,

_____

[2]     Plaintiff reported that he first received injections for shoulder pain over ten years earlier. (A.R. 1122.)

finding that they showed a "severe full thickness cuff tear" and "subscapularis tear." (A.R. 1123.) Based on his findings, Dr. Schilz prescribed Ibuprofen, heat, and exercises, and he referred plaintiff to radiology for an MRI of his left shoulder.  (A.R. 1124.)  On September 25, 2010, plaintiff received an MRI of his left shoulder, which showed: "cephalad migration of the humeral head with chronic full-thickness tear of the supraspinatus tendon with severe muscle atrophy[;] likely full-thickness tear of subscapularis tendon with severe muscle atrophy[;] partial undersurface tear infraspinatus tendon with severe muscle atrophy[;] moderate osteoarthritic change of the acromioclavicular joint." (A.R. 1128.) On October 26, 2010, plaintiff saw Dr. Schilz for a third time.  He reviewed the x-rays of plaintiff's left shoulder and determined that they also showed a "severe full thickness cuff tear." (A.R. 1145.)  Dr. Schilz advised plaintiff that the tear was not a good candidate for surgical repair because of its size, the fatty infiltration, and the loss of acromiohumeral space. (A.R. 1146.)  Plaintiff accepted Dr. Schilz's referral to physical therapy (*see* A.R. 1216 (referred to physical therapy by Dr. Schilz)), and, in 2011, plaintiff began seeing a physical therapist, Ryan Reyes, for his knee and shoulder pain.  (A.R. 1216 (July 22, 2011 - treatment for shoulder pain), 1233 (August 24, 2011 - treatment for shoulder pain), 1244 (September 12, 2011 - treatment for shoulder pain), 1259 (September 21, 2011 - treatment for knee and shoulder pain).)

The record also contains the opinion of the consulting physician, Dr. Vincent R.Bernabe, an orthopedic surgeon.  (A.R. 1300.)  Dr. Bernabe diagnosed plaintiff with: a bilateral osteoarthritis and a bilateral shoulder rotator cuff tear in his shoulders: chondromalacia patella in both knees;[3] and status post open repair and wiring of the left patellar tendon. (A.R. 1299.) He found that plaintiff retained the capacity to frequently lift and carry 11 and possibly 20

---

[3] Doctors do not fully understand the relationship of chondromalacia to osteoarthritis, but most agree that severe chondromalacia is an osteoarthritic process.  VINCENT J. VIGORITA, ORTHOPAEDIC PATHOLOGY 675 (Jonathan Pine et al. eds., 2d ed. 2008).

pounds,[4] and could occasionally engage in reaching or pushing and pulling. (A.R. 1291-92, 1300.) Dr. Bernabe also opined that plaintiff should only occasionally engage in "overhead motion." (A.R. 1300.)

In sum, both orthopedic surgeons who assessed plaintiff's shoulder pain agreed that plaintiff suffered bilateral rotator cuff tears. Nevertheless, the ALJ found that plaintiff did not have a medically determinable shoulder impairment as of the date he was last medically insured (December 31, 2011), because on the checklist accompanying his report, Dr. Bernabe wrote the date of his report -- "1/19/2012" -- in response to the question: "The limitations above are assumed to be your opinion regarding current limitations only. However, if you have sufficient information to form an opinion within a reasonable degree of medical probability as to past limitations on what date were the limitations you found above first present?" (A.R. 24; *see also* A.R. 1295.) The ALJ's assumption that Dr. Bernabe's answer to this question means that plaintiff's shoulder and right knee impairments were not medically determinable impairments as of December 31, 2011 -- 20 days before Dr. Bernabe's report -- is misplaced and contradicted by the record. First, it is plain from Dr. Bernabe's report that he was not describing impairments that arose on the day he wrote his report but, rather, impairments that were both described in the "approximately 100 pages of medical records" that Dr. Bernabe reviewed before writing his report on January 19, 2012, and were present during Dr. Bernabe's examination of plaintiff. Second, as described above, there is substantial evidence in the record showing that Dr. Iinuma diagnosed plaintiff with osteoarthritis no later than September 2009, and Dr. Schilz diagnosed plaintiff with an unoperable bilateral shoulder rotator cuff tear in August 2010, over a year before plaintiff's date last insured.

The ALJ characterized the record as containing only "intermittent references to shoulder

---

[4]   Dr. Bernabe stated in his report that plaintiff could lift and carry 20 pounds only occasionally, but, on the "Medical Source Statement Of Ability To Do Work-Related Activities (Physical)," Dr. Bernabe checked the boxes indicating that plaintiff could frequently lift and carry 20 pounds. (*Compare* A.R. 1290 *with* A.R. 1300.)

and right knee problems." (A.R. 24.)  However, unless the ALJ did not read Dr. Heer and Dr. Schilz's treatment notes, the record cannot be characterized as containing only "intermittent references" to knee and shoulder problems.  These notes showed that plaintiff saw multiple orthopedic surgeons and was affirmatively diagnosed with osteoarthritis in his right knee and an unoperable bilateral rotator cuff tear in his shoulders after a series of physical examinations, x-rays, and MRIs.

Finally, the ALJ suggested that any error in his failure to recognize plaintiff's osteoarthritis and rotator cuff tear as "medically determinable" impairments was harmless, because there was not "substantial evidence to establish a medical determinable impairment . . . that caused limitations beyond those addressed by [his] residual functional capacity assessment." (A.R. 24.)  Again, the Court disagrees.  At a minimum, the ALJ omitted Dr. Bernabe and Dr. Schilz's restrictions on overhead motion from his assessment of plaintiff's RFC.  (*Compare* A.R. 27 (ALJ's RFC assessment) *with* 1098, 1112 (Schilz cautions plaintiff to "avoid overhead weights") *and* 1292, 1300 (Dr. Bernabe states that plaintiff can only occasionally engage in overhead reaching).)  Accordingly, the ALJ erred in failing to find that plaintiff's shoulder and right knee impairments were not medically determinable, and his error was not harmless.  (A.R. 24.)

## II.    THE ALJ DID NOT PROPERLY EVALUATE DR. PATEL'S OPINION.

Plaintiff's fourth contention is that the ALJ failed to properly assess the opinion of Dr. Sachin Patel, the orthopedic surgeon who operated on plaintiff's left knee in November 2007, following plaintiff's fall down the stairs. (Joint Stip. 3, 30-33; *see also* A.R. 496-513 (treatment notes from San Antonio Community Hospital for 11/03/07 through plaintiff's surgery on 11/08/07).)  On October 5, 2009, Dr. Patel filled out a residual functional capacity questionnaire describing plaintiff's limitations for the period from March 27, 2008, through the date of his report. (*See* A.R. 610-16.)  In the questionnaire, Dr. Patel stated that, *inter alia*:  he saw plaintiff "as needed" for his left patellar tendon rupture (A.R. 610); plaintiff experienced daily aching pain,

13

reduced range of motion, muscle weakness, and muscle atrophy (A.R. 611); plaintiff could walk one mile without rest or about 30 minutes and, during an eight-hour work day, could stand/walk for about four hours (A.R. 613); plaintiff would need unscheduled breaks during an eight-hour work day (A.R. 614); and plaintiff would be absent from work about twice a month (A.R. 615).

On January 19, 2012, Dr. Bernabe affirmed that plaintiff's limitations included "status post open repair and wiring of the left patellar tendon" (A.R. 1299), but he observed that plaintiff's gait was normal and he did not use an assistive device to ambulate. (A.R. 1297.)  In contrast with Dr. Patel's 2009 assessment that plaintiff could stand and walk for only four hours in an eight-hour work day, Dr. Bernabe found that plaintiff could walk and stand for six hours out of an eight-hour work day.  (A.R. 1300.)

The ALJ credited Dr. Patel's assessment that plaintiff could walk for a mile without resting but also credited the conflicting assessment of Dr. Bernabe that plaintiff could stand/walk for up to six, as opposed to four, hours in an eight hour work day (A.R. 27), and he rejected Dr. Patel's "more restrictive limitations":

> Dr. Patel's more restrictive limitations -- such as that the claimant could stand/walk for "about 4 hours" in an eight-hour day, needed unscheduled rest breaks, and would likely be absent from work about twice per month as a result of his impairments or treatment . . . -- are not fully consistent with other substantial evidence, including Dr. Patel's statement that the claimant could walk a mile without resting and the claimant's treatment notes indicating that he was walking two miles per day by March of 2008 and going to the gym -- and using a "stair climber" -- two to three times per week later that year.  Further, as also noted in my prior decision, Dr. Patel's prediction that the claimant would likely be absent from work twice per month is contradicted by Dr. Iinuma, who, although generally less sanguine than Dr. Patel as to the claimant's alleged limitations, . . . concluded that the claimant

14

1    would likely be absent "less than once a month."  Accordingly, I likewise give

2    reduced weight to Dr. Patel's opinion to the extent that it is inconsistent with Finding

3    #5 . . . .

4

5    (A.R. 29-30.)

6

7        When a treating or examining physician's opinion is not contradicted by another physician,

8    it may be rejected only for "clear and convincing" reasons that are supported by substantial

9    evidence.  Ghanim v. Colvin, 763 F.3d 1154, 1160-61 (9th Cir. 2014); Lester v. Chater, 81 F.3d

10   821, 830 (9th Cir. 1995).  When it is contradicted by another doctor's opinion, a treating or

11   examining physician's opinion may only be rejected if, after considering the factors set out in 20

12   C.F.R. § 404.1527(c)(2)-(6) for evaluating medical opinions, the ALJ articulates "specific and

13   legitimate" reasons supported by substantial evidence in the record.[5]  Garrison, 759 F.3d at 1012;

14   Orn, 495 F.3d at 632.  Accordingly, an ALJ confronted with conflicting medical opinions must

15   consider, inter alia, the length of the treatment relationship and the frequency of examination; the

16   medical specialties of the various medical sources; the extent to which the medical opinions are

17   supported by explanations; and the consistency of each medical opinion with the record as a

18   whole.  20 C.F.R. § 404.1527(c)(2)-(6); see also Orn, 495 F.3d at 631.

19

20       Here, the ALJ found that Dr. Patel's opinions about plaintiff's left knee impairments

21   conflicted with the opinions of Dr. Bernabe and Dr. Iinuma.  The Court disagrees.  More than two

22   years passed between Dr. Patel's and Dr. Bernabe's assessments of plaintiff's limitations and

23   neither doctor suggested that their opinion was valid for the time period covered by the other's

24   _____

25       [5]      When an examining physician relies on the same clinical findings as a treating
     physician, but differs only in his or her conclusions, the conclusions of the examining physician
26   are not "substantial evidence."  Orn, 495 F.3d at 632.  However, when an examining physician
     provides "independent clinical findings that differ from the findings of the treating physician," such
27   findings are "substantial evidence" and provide a sufficient basis for rejecting the opinion of the
     treating doctor.  Id.  Independent clinical findings can be either (1) diagnoses that differ from
28   those offered by another physician and that are supported by substantial evidence or (2) findings
     based on objective medical tests that the treating physician has not herself considered.  Id.

1  opinion.  Further, Dr. Patel's opinion concerned the period closer to the date of plaintiff's injury

2  and surgery, and the record suggests that there was some degree of medical improvement during

3  that time that may have continued after Dr. Patel provided his opinion.

4

5      The ALJ also suggested that Dr. Patel's October 2009 determination that plaintiff's left knee

6  impairment would cause him to miss work about twice a month conflicted with Dr. Iinuma's

7  September 2009 opinion.  (*See* A.R. 29.)  However, Dr. Iinuma did not express an opinion about

8  the effect of plaintiff's left knee impairment on his residual functional capacity.  Instead, he limited

9  his opinion to the effect of plaintiff's osteoarthritis on his residual functional capacity.  (*See* A.R.

10  603 .)  Accordingly, the ALJ has not established that Dr. Patel's assessment of plaintiff's limitations

11  arising from the post-operative status of his left knee for the period between March 2008, and

12  October 2009, conflicts with the opinion of another physician; thus, the ALJ was required to cite

13  clear and convincing reasons for rejecting that opinion.

14

15      The ALJ's reasons for discrediting Dr. Patel's opinion do not meet this standard.  First,

16  rather than citing specific reasons for discounting Dr. Patel's "more restrictive limitations," the ALJ

17  made the sweeping assertion that these limitations were "not fully consistent with other

18  substantial evidence." (A.R. 29.)  Second, the only evidence that the ALJ cited as conflicting with

19  Dr. Patel's assessment were plaintiff's physical therapist's notations that, in April 2008, plaintiff

20  reported walking two miles a day[6] and, in August 2008, he reported going to the gym two to three

21  times per week to do leg strengthening exercises and doing the stair climber for ten minutes at

22  each visit.  (A.R. 29; *see also id.* 560 -- August 18, 2008 treatment notes, 581 -- April 21, 2008

23  treatment notes.)  Plaintiff's reports to the physical therapist that he could perform this very

24  minimal exercise is not inconsistent with Dr. Patel's assessment that plaintiff could only stand/walk

25  ────────────────

26      [6]   It is not clear that plaintiff was walking without the help of an assistive device.  The
    physical therapist's functional goal for plaintiff was to walk 30 minutes without an assistive device
27  and the physical therapist did not change that goal until June 30, 2008.  In addition, at the April
    2008 appointment, plaintiff stated that he experienced hyperextension and poor stability while
28  walking, and the physical therapist told plaintiff that he could wear a knee brace for stability.
    (A.R. 581.)

for four hours in an eight-hour day, would need unscheduled rest breaks, and would be absent from work about twice a month.[7]

Based on the foregoing, the Court finds that Dr. Patel's assessment of plaintiff's limitations -- at least for the period between February 2007, and October 2009 -- did not conflict with another physician's opinion, and the ALJ erred in failing to provide "clear and convincing" reasons for rejecting that assessment.   On remand, the ALJ is required to either credit Dr. Patel's assessment or identify clear and convincing reasons for rejecting it.

## III.   THE ALJ DID NOT ARTICULATE SPECIFIC, CLEAR, AND CONVINCING REASONS FOR REJECTING PLAINTIFF'S SUBJECTIVE TESTIMONY.

Plaintiff's fifth contention is that the ALJ failed to properly credit plaintiff's subjective pain testimony.  (Joint Stip. at 3, 36-39.)  On January 26, 2008, less than three months after his left knee surgery, plaintiff filled out a daily activities questionnaire.  (A.R. 261.)  At that time, he reported that he could only walk with a walker and, even then, could only walk a short distance.  (*Id.*)  He stated that he could not lift anything and could only carry something if he was in his wheelchair.  (*Id.* 262.)  He stated that, as a result of the injury to his left knee and its status post-surgery, he does not grocery shop, clean, drive, or do yard work.  (*Id.*)

On October 7, 2009, plaintiff testified before the ALJ that, at that time, he could stand for 30 to 60 minutes without experiencing pain or discomfort, could walk about a block, and could sit for 30 to 60 minutes without experiencing pain or discomfort.  (A.R. 96-97.)  He testified that he experienced swelling after walking.  (A.R. 97.)  He further testified that he prepared meals and did the dishes but experienced pain in his left knee when doing so.  (A.R. 98-99.)  Plaintiff

---

[7] Plaintiff's ability to walk to two miles a day *is* inconsistent with Dr. Patel's assessment that plaintiff could only walk one mile a day, but the ALJ nevertheless credited Dr. Patel's opinion on that point, stating that it was "well supported by Dr. Patel's findings and conclusions and consistent with other evidence in the longitudinal record."  (*See* A.R. 29.)

1  similarly testified that he experienced pain in his left knee when he washed, bathed, and/or
2  dressed himself.  (A.R. 99.)  He testified that he could drive.  (A.R. 100.)  He  also testified that
3  he took medications for anxiety, which calmed him.  (A.R. 101.)  On questioning from his lawyer,
4  plaintiff added that he began experiencing "pretty severe" pain in his right knee after he removed
5  the brace from his left knee.  (A.R. 101-02.)  He stated that, in August 2009, he started seeking
6  treatment for his right knee from Dr. Heer.  (A.R. 103.)  Finally, he testified that, in an eight-hour
7  day, he could be on his feet for about an hour to an hour and a half (A.R. 103) and could lift ten
8  to 20 pounds without injuring himself.  (A.R. 103.)

9

10      On May 1, 2012, plaintiff testified before the ALJ that, because of the bilateral ruptures of
11  his rotator cuffs, he could not lift anything overhead (A.R. 63) and could only lift his arms up to
12  about the height of a table (A.R. 64.)  He added that his right knee "bothers [him] all the time"
13  and causes "a lot of pain."  (A.R. 65.)  He stated that he has a hard time walking up stairs.  (A.R.
14  67.)  He stated that he takes medication for anxiety and depression, and although it does not
15  always get his anxiety down to a level that is acceptable, it relaxes him.  (A.R. 67.)  Plaintiff
16  testified that, despite the beneficial effects of the Celexa and Ativan, he tended to stay at home,
17  even when staying home meant missing his family's holiday celebrations.  (A.R. 68.)

18

19      "In assessing the credibility of a claimant's testimony regarding subjective pain or the
20  intensity of symptoms, the ALJ engages in a two-step analysis." Ghanim, 763 F.3d at 1163
21  (quoting Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012)).  "First, the ALJ must determine
22  whether the claimant has presented objective medical evidence of an underlying impairment
23  which could reasonably be expected to produce the pain or other symptoms alleged." Id. (quoting
24  Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009)).  "If the claimant meets the first test and
25  there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the
26  severity of the symptoms if she gives 'specific, clear and convincing reasons' for the rejection."
27  Id. (quoting Vasquez, 572 F.3d at 591). "General findings are insufficient; rather, the ALJ must
28  identify what testimony is not credible and what evidence undermines the claimant's complaints."

1   Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996).

2

3       Here, the ALJ did not meet this standard.  The ALJ did not identify what specific testimony

4   he found not credible and did not identify specific portions of the evidence that undermined this

5   testimony.  Instead, he wrote broadly:

6

7           [T]here appears to be somewhat of a disconnect between the claimant's

8       subjective complaints on one side, and what the modest diagnostic and clinical

9       evidence in the relevant period will reasonably support on the other . . .  [T]he lack

10      of objective evidence to substantiate his claims of disabling impairment throughout

11      the period at issue tends to undercut the claimant's overall credibility as to his

12      allegations in this case.

13

14          The credibility of his claims is further reduced by reference to the claimant's

15      overall treatment history and use of medications, which, as noted in my prior

16      decision and reaffirmed by my review of the medical evidence received since the

17      time of that decision, reflects that the claimant's conditions have generally

18      responded well to mainly conservative measures following his left knee surgery in

19      late 2006.  As mentioned, I see no significant evidence of treatment for end organ

20      damage or other major complications associated with the claimant's hypertension,

21      diabetes, or obesity . . . .  [I]f his conditions were as severe as he claims, one might

22      reasonably expect to see more aggressive and/or more consistent forms of

23      treatment.

24

25  (A.R. 30-31.)

26

27      The ALJ also found that plaintiff had made statements that suggested "he has had greater

28  capabilities than he has at times alleged" and "has not been completely frank."  (A.R. 31-32.)

19

1   Specifically, the ALJ noted that plaintiff alleged at the May 1, 2012 hearing "that he is unable to
2   perform many activities such as lifting objects and walking up stairs without experiencing pain or
3   other symptoms" but also "attested to his overall ability to tend to most of his basic needs,
4   including in statements he made to the consultative psychologist on December 23, 2011, at which
5   time he reportedly stated that he 'does not need assistance any activities of daily living with the
6   exception of cooking due to the pain that he experiences in his knees and shoulders.'" (A.R. 31.)

8        The ALJ's sweeping characterizations of the medical record as lacking in objective evidence
9   of plaintiff's claims, of plaintiff's treatment history as insufficiently aggressive, and of plaintiff's
10  statements about his ability to perform daily living activities as inconsistent do not provide clear
11  and specific reasons for rejecting plaintiff's subjective symptom testimony as a whole.  They are
12  also not supported by substantial evidence

14       In particular, the Court notes that the ALJ implicitly rejected plaintiff's testimony about his
15  inability to engage in overhead lifting or reaching even though the objective medical evidence
16  overwhelmingly supported plaintiff's claim.  Both Dr. Schilz, plaintiff's treating physician for his
17  shoulder impairments, and Dr. Bernabe stated that plaintiff was limited in his ability to engage in
18  overhead reaching. (A.R. 1098, 1112 -- 8/10/10: Dr. Schilz cautions plaintiff to "avoid overhead
19  weights", 1292, 1300 -- 1/19/12: Dr. Bernabe states that plaintiff can only occasionally engage
20  in overhead reaching.)  Further, the ALJ suggests that plaintiff's claim is not credible because he
21  failed to seek more aggressive treatment for it, but Dr. Schilz expressly advised plaintiff that he
22  was not a good candidate for surgery.  Finally, there is nothing inconsistent between plaintiff's
23  stated ability to perform most daily living activities, albeit often with pain, and his testimony that
24  he cannot engage in overhead activity.  In sum, the ALJ made only general findings about
25  plaintiff's credibility, findings that did not support the ALJ's decision to reject plaintiff's subjective
26  symptom testimony *in toto*.  On remand, the ALJ must "identify what testimony is not credible and
27  what evidence undermines the claimant's complaints" and articulate clear and convincing reasons
28  for rejecting the plaintiff's testimony about the severity, intensity, and persistence of his

1  symptoms.  *See* Ghanim, 763 F.3d at 1163.

3  **IV.    REMAND FOR FURTHER PROCEEDINGS IS APPROPRIATE.**

5  On December 9, 2014, the undersigned heard oral arguments on plaintiff's contentions that
6  (1) the ALJ denied plaintiff the opportunity for effective cross-examination of the VE, and (2) the
7  appropriate remedy for the ALJ's errors is the immediate calculation and award of benefits.  (Joint
8  Stip. at 9-13, 14-15.)

10  **A.    Background**

12  On February 4, 2011, the Appeals Council reversed and vacated the ALJ's initial decision
13  on plaintiff's application for benefits and stated, *inter alia*, that "proper characterization of
14  claimant's past relevant work is critical to the outcome of this case, since if the claimant was
15  determined to be not capable of performing past relevant work, he would most likely [be] found
16  disabled at step 5 of the sequential evaluation process based on his age, education, work
17  experience, and residual functional capacity, assuming that he was found to have no transferable
18  skills requiring more than minimal vocational adjustment to other light work."  (A.R. 117-18; *see*
19  *also* Medical-Vocational Guidelines, 20 C.F.R. Pt. 404, Subpt. P, Appendix 2, § 202.06 (an
20  individual of advanced age with only a high school education who is found to have no transferable
21  skills is disabled).)  The Appeals Council ordered the ALJ on remand to obtain evidence from a VE
22  to clarify the demands of plaintiff's past relevant work and, if necessary, determine whether he
23  has acquired any skills that are transferable with very little, if any, vocational adjustment to other
24  occupations.  (A.R. 118.)

26  On November 9, 2011, the ALJ held the first hearing following the remand order, but no
27  VE was present.  (*See* A.R. 75.)  When plaintiff's attorney indicated that he was surprised to find
28  no VE given the remand order, the ALJ stated "They cannot order me to do anything, if you

understand that.  They can suggest it, but they can't order me to do that.  And if I choose to have a vocational expert, that's one of my decisions in this case, specifically at step four."  (A.R. 75.)

Nevertheless, on June 5, 2012, the ALJ solicited a VE's testimony by interrogatory.  (A.R. 351.)  The ALJ did not give the VE an opportunity to opine about an individual's potential to perform plaintiff's past relevant work -- or other work that exists in the substantial numbers in the national economy -- if that individual suffered from greater limitations than those contained in the ALJ's residual functional capacity assessment.  (*See* A.R. 355.)  Plaintiff objected to the ALJ's decision to submit only "one hypothetical question premised on an RFC for a range of light work." (A.R. 348.)  The ALJ allowed plaintiff to submit cross-interrogatories, (*see* A.R. 374), but the VE indicated that she no longer had plaintiff's file when she began answering plaintiff's questions (A.R. 375).  In his brief to the Appeals Council, plaintiff sought a remand to the ALJ for cross-examination of the VE.  (A.R. 394.)  The Appeals Council denied plaintiff's request when it denied review of the ALJ's decision.  (A.R. 1-3.)

### B.    Arguments

Plaintiff and defendant agree that the interrogatory process used in this case did not give plaintiff an adequate opportunity to develop the VE's testimony, and defendant is willing to voluntarily remand the matter for cross-examination of the VE.[8]  (*Id.* at 13.)  In his Reply to defendant's contentions, however, plaintiff argues that, defendant has been "recalcitrant" on this issue up until this point, rendering a voluntary remand for cross-examination an inadequate remedy at this stage in the proceedings.  (*Id.* at 14.)

---

[8]  Defendant states, without citation, that the Appeals Council "reconsidered its position on this issue [of cross-examination] and agreed to accept voluntary remand," but "plaintiff declined the offer of remand."  (Joint Stip. at 13.)  It is unclear when defendant decided to accept voluntary remand given that plaintiff states that he offered voluntary remand to defendant twice -- first to the Appeals Council and then during settlement talks -- and defendant rejected both offers. (Joint Stip. at 14.)

"[T]wice [plaintiff] offered the relief defendant now seeks:  first to the Appeals Council (A.R. 394) and subsequently to defendant's counsel through proposed settlement per order of the Court.  Defendant has twice declined, forcing plaintiff to brief all of the relevant issues in this case.  Additionally, defendant has twice sought extensions of time to file her portion of this joint stipulation, and only belatedly considered remand on one issue only . . . .  At some point the question of a recalcitrant agency must be considered.

(Joint Stip. at 14.)

Plaintiff asserts that it took the ALJ more than 16 months to comply with the Appeals Council's remand order to solicit testimony from a VE and over a year and a half from the date of the Appeals Council's remand order to issue a decision.  (Joint Stip. at 14-15.)  The Appeals Council then took another 13 months from the date of the ALJ's decision to deny review, a decision that the Appeals Council now concedes was in error.  (*See* Joint Stip. at 14-15.)  In view of the many years of delay,[9] plaintiff contends "there is nothing to indicate any . . . less time will lapse following yet another remand" and, even if there were, he argues that the ALJ's numerous errors, including his failure to allow for effective cross-examination of the VE, warrant crediting the opinions of Dr. Ruddock and Dr. Patel and awarding benefits.  (*See* Joint Stip. at 15.)  Thus, the first issue in dispute is not whether plaintiff was denied an opportunity to effectively cross-examine the VE but, rather, whether a remand for further proceedings is an appropriate remedy for the ALJ's errors.

---

[9]  Plaintiff points out that his last date insured expired while waiting for the ALJ to hold hearings and issue a decision on remand, and he lost his house during the seven years he has now spent waiting for a decision on his application for benefits.  (Joint Stip. at 15.)

1

### C.    Analysis

2

3        Plaintiff cites no case law to support his position that the Court can award benefits outright

4   based on the time that has passed since he filed his application for benefits, the defendant's

5   delays in reaching a decision, or the defendant's alleged recalcitrance.   The Court is aware,

6   however, that other courts outside of the Ninth Circuit have permitted an award of benefits where

7   a claimant has made a prima facie case that he is entitled to benefits and waited five or more

8   years for his case to be properly adjudicated by the Commissioner.   *See e.g.*, Donahue v.

9   Massanari, 166 F. Supp.2d 1143, 1150-51 (E.D. Mich. 2001) (awarding benefits to a claimant who

10  was approaching 59 years of age, had applied for benefits over seven years earlier, had an

11  extensive work history, and established a prima facie case of entitlement); *see also id.* (discussing

12  cases in the Second, Third, Fifth, Seventh, and Tenth Circuits that reached similar conclusions).

13

14       Under Ninth Circuit case law, the Court has discretion to remand a case "either for

15  additional evidence and findings or to award benefits." Brewes v. Commissioner of Soc. Sec., 682

16  F.3d 1157, 1164 (9th Cir. 2012) (quoting Smolen, 80 F.3d at 1292).   The Court may direct an

17  award of benefits "where the record has been fully developed and where further administrative

18  proceedings would serve no useful purpose." *Id.*   In contrast, "[r]emand for further proceedings

19  is appropriate where there are outstanding issues that must be resolved before a disability

20  determination can be made, and it is not clear from the record that the ALJ would be required to

21  find the claimant disabled if all the evidence were properly evaluated." Taylor v. Comm'r of Soc.

22  Sec., 659 F.3d 1228, 1235 (9th Cir. 2011); *see also* Luna v. Astrue, 623 F.3d 1032, 1035 (9th Cir.

23  2010) (district court did not err in remanding for further proceedings where, even if the evidence

24  that the ALJ improperly evaluated were credited, outstanding issues would need to be resolved

25  fo a proper disability determination to be made).

26

27       The Court has reviewed Ninth Circuit cases in which that court exercised its discretion to

28  direct an award of benefits.   In these cases, a VE testified that the claimant could perform either

24

1   (1) his past relevant work or (2) other work that exists in significant numbers in the national

2   economy, given his age, education, work experience, and residual functional capacity.   In

3   Garrison, for example, the Ninth Circuit remanded for an immediate award of benefits because

4   "a treating doctor, a treating nurse practitioner, and an examining psychologist all deemed

5   Garrison to be disabled, Garrison testified to an array of severe physical and mental impairments,

6   and a VE explicitly testified that a person with the impairments described by Garrison or her

7   medical caretakers could not work."   Garrison, 759 F.3d at 1022.   Similarly, in Brewes, the Ninth

8   Circuit found that further proceedings were not necessary because "[t]he vocational expert

9   testified that a person with Brewes' characteristics who would miss that much work was not

10   employable."   Brewes, 682 F.3d at 1165.

11

12       Unlike Garrison and Brewes, however, the VE in this case did not receive an opportunity

13   to hypothesize about whether a claimant of plaintiff's age, education, and work experience who

14   has a residual functional capacity based on a proper evaluation of the medical record could

15   perform work that exists in significant numbers in the national economy.   Further, even if the

16   Court were to credit as true all of the evidence that the ALJ rejected, it is not clear when the

17   cumulative effect of plaintiff's various impairments became disabling nor whether plaintiff would

18   be entitled to ongoing disability benefits or to benefits for a "closed" period of disability, nor what

19   the dates of such a period would be.   Thus, there are multiple outstanding issues that must be

20   resolved and the immediate award of benefits is not appropriate.

21

22       Although the facts of this case preclude the Court from awarding benefits at this juncture,

23   the Court is not insensitive to the fact that defendant's errors and delays have forced a now 65

24   year old man to wait more than seven years for a fair adjudication of his application for benefits.

25   It is particularly extraordinary, given the clarity of the Appeals Council's remand order, that the

26   ALJ waited eight months after the remand order to solicit a VE's testimony and proceeded as he

27   did -- using interrogatories -- despite plaintiff's objections and repeated requests to have a VE

28   testify in person.   Given the ALJ's delays and failure to properly evaluate the evidence, remand

to a different ALJ is necessary.  *Cf.* Reed v. Massanari, 270 F.3d 838, 845 (9th Cir. 2001) (remanding to different ALJ for fair consideration of evidence despite no indication of ALJ bias); Campbell v. Astrue, 2009 WL 3244745, *10, n.11 (C.D. Cal. Oct. 7, 2009) (remanding to a different ALJ for reconsideration of the plaintiff's claim for disability benefits because the ALJ ignored the Appeals Council's remand order, causing the Court to have "serious concerns about that ALJ's ability to further review this matter").

In addition, defendant is ordered to hold a hearing within 120 days of the date of this decision, provide plaintiff with an opportunity to cross-examine the VE at that hearing, and issue a decision that complies with this Memorandum Opinion and Order within 60 days of the date of the hearing.  *Cf.* Butts v. Barnhart, 416 F.3d 101, 103-06 (2d Cir. 2005) (affirming imposition of time limits for a decision on the remand of the plaintiff's disability claim for further proceedings); Barnett v. Bowen, 794 F.2d 17, 22 (2d Cir. 1986) (injunctive relief is an appropriate remedy for individual social security cases involving unreasonable delays, despite the fact that absolute periods of limitations applicable to all claims are invalid); Barbour v. Astrue, 950 F. Supp.2d 480, 491 (E.D. N.Y. 2013) ("As it has been more than seven years since the plaintiff filed his initial application for benefits, a time limit is appropriate in this case to prevent undue delay."); Guzzi v. Heckler, 617 F. Supp. 916, 917 (D. Fla. 1985) ("although it is clearly not within the province of this Court's powers to mandate across the board time limits by which the SSA must abide, it is within this Court's power to direct the Office of Hearings and Appeals to give the plaintiff in this case a *de novo* hearing within one hundred and twenty days from the date of this Order" and, if a hearing is not commenced within one hundred twenty days from the date of this Order, to issue an Order to Show Cause why the Commissioner should not be held in contempt); Rowland v. Barnhart, 2002 WL 31103231, *1-3 (D. Kan. Sep. 18, 2002) (finding that the Court has the authority to order a time-limit upon remand in a social security case); White v. Shalala, 1993 WL 498025, *1 (E.D. Pa. Nov. 24, 1993) (district court did not err in imposing a time limit on the remand in a case where the Commissioner created an unreasonable delay in adjudicating the plaintiff's disability claim by failing to consider available relevant evidence at the Appeals Council

1  stage); *see also* HALLEX 1-2-1-55.D.2 (articulating agency procedures following a time-limited
2  court remand).

4  **CONCLUSION**

6      For the reasons stated above, IT IS ORDERED that the decision of the Commissioner is
7  REVERSED, and this case is REMANDED for further proceedings consistent with this Memorandum
8  Opinion and Order.

10     IT IS FURTHER ORDERED that an ALJ other than James D. Goodman hear the matter on
11  remand.

13     IT IS FURTHER ORDERED that defendant is ordered to hold a hearing within 120 days of
14  the date of this decision, provide plaintiff with an opportunity to cross-examine the VE at that
15  hearing, and issue a decision that complies with this Memorandum Opinion and Order within 60
16  days of the date of the hearing.

18     IT IS FURTHER ORDERED that the Clerk of the Court shall serve copies of this
19  Memorandum Opinion and Order and the Judgment on counsel for plaintiff and for defendant.

21     **LET JUDGMENT BE ENTERED ACCORDINGLY**.

23  DATED: December 16, 2014

                                        *Margaret A. Nagle*
                                        _____
                                        MARGARET A. NAGLE
                                        UNITED STATES MAGISTRATE JUDGE